IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| VI DERIVATIVES, LLC, by VIFX LLC, | : | CIVIL ACTION |
| its TAX MATTERS PARTNER, by | : | |
| RICHARD VENTO, its TAX MATTERS | : | No. 06-12 |
| PARTNER, | : | [consolidated] |
| | : | |
| Petitioner, | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |

**MEMORANDUM**

**Juan R.  Sánchez, J.**                                                                 **February 18, 2010**

In 2001, the five members of the Vento family[1] filed their income tax returns with the Virgin

Islands Bureau of Internal Revenue (BIR).  In 2005, both the BIR and the United States Government

issued Notices of Deficiency to the Ventos.  After receiving these notices, each Vento family

member filed a petition to determine his or her income tax liability for 2001.  The Ventos' petitions

were consolidated into the instant case.  In June 2010, this Court held a bench trial for the sole

purpose of determining whether the Ventos were bona fide residents of the Virgin Islands during the

2001 tax year.  For the reasons set forth below, this Court finds no member of the Vento family was

a bona fide resident of the Virgin Islands during 2001.

---

[1]  The Vento family members who are parties to this consolidated case are Richard and Lana Vento
and their three adult children, Nicole Mollison, Gail Vento, and Renee Vento.  Each family member
is referred to herein by first name.

1

**FINDINGS OF FACT**[2]

1.   From 1995 through 2000, and for most of 2001, Richard and Lana Vento lived in a home on the north shore of Lake Tahoe at 889 Lakeshore Boulevard in Incline Village, Nevada (Incline Village House).  The Incline Village House was fully furnished and contained more than $500,000 worth of artwork and approximately 20 automobiles.

2.   In 2000 and 2001, Richard and Lana also owned two homes in Haleiwa, Hawaii, two homes on the south shore of Lake Tahoe,[3] and a condominium in Park City, Utah.

3.   In early 2001, the Vento's eldest daughter, Nicole Mollison, lived in a separate home in Incline Village, Nevada, with her husband and three children.

4.   In early 2001, the Vento's second eldest daughter, Gail Vento, lived in Boulder, Colorado.

5.   In early 2001, the Vento's youngest daughter, Renee Vento, lived in San Diego, California.

6.   In 2001, the Ventos maintained a family office at 865 Tahoe Boulevard in Incline Village, Nevada.  The family office was never moved to the Virgin Islands.[4]

7.   Richard was a founder of Objective Systems Integrators, Inc. (OSI), a very successful technology business.

8.   In 2000, Richard and the other owners of OSI agreed to sell OSI to Aligent Technologies,

---

[2] The factual findings relevant to all members of the Vento family appear first, followed by the facts particular to each family member.

[3] These two homes were located in Granite Bay, California, and Tahoe City, California.

[4] Richard testified the office was not moved to the Virgin Islands, the Ventos' purported new home, for the convenience of Stephanie Tall, a part-time employee hired sometime in 2001.  Richard stated Tall knew a lot about the company, but admitted Tall worked less than four days a week and less than eight hours a day.  Thus, Richard's testimony the Ventos did not move the family office for the sake of a part-time employee who had been employed by the family for less than one year was not credible.

Inc.  They planned to close the sale in early 2001.

9.      Richard's OSI shares were held in the name of three LLCs that he created on his behalf of

his daughters:  Nicole Vento, LLC; Gail Vento, LLC; and Renee Vento, LLC.  These LLCs

were managed by Richard and Lana.  Collectively, Richard, members of his family, and the

other business entities they controlled owned 10 million shares of OSI stock.

10.     Richard was interested in minimizing his and his family's tax burden on gains from the sale

of OSI.  To that end, in early 2001 Richard and Lana hired Gary Hatch, an employee of

McKenzie Finch, LLC, to create a strategy to reduce the taxes the Ventos would pay based

on proceeds Richard, and various LLCs he controlled, would receive from sale of the OSI.

11.     Specifically, Richard asked McKenzie Finch to "recommend what to do with Vento LLC

capital gains" realized from the sale of the OSI.[5]

12.     The Ventos realized a $180 million gain from their sale of the OSI.

13.     On the date the OSI sale was finalized, in January 2001, no member of the Vento family had

ever traveled to the Virgin Islands or had considered moving there.

14.     In March 2001, the Vento family took a vacation, during which they chartered a private yacht

and traveled between the United States Virgin Islands and the British Virgin Islands, visiting

approximately 10 different islands.  Nicole, her husband, and her three children went on this

cruise, as did Renee, Gail, and Gail's then-boyfriend, Eric Walker.[6]

---

[5] Richard filled out a worksheet provided by McKenzie Finch, in which he indicated how many
shares he wanted to allocate amongst various entities. Ex. 165.  In the tax section, he indicated he
wanted to allocated "only enough [shares] to pay any taxes I owe annually."  *Id.*

[6] The Ventos assert Richard addressed the family members at the conclusion of this cruise and asked
if they wanted to make the Virgin Islands their residence because of the enjoyable weather, water,
and marinas.  No plan as to how or when to move to the Virgin Islands was proposed.  The Ventos

15.   Richard was aware his family would save more than $9 million in taxes if they were deemed bona fide residents of the Virgin Islands as of December 31, 2001.

16.   Richard wanted to participate in the Virgin Islands' business incentive program operated by the Economic Development Commission (the EDC Program), which affords certain tax benefits to businesses based in the Virgin Islands.  Richard felt the tax savings offered in the Virgin Islands would help him to be more competitive on a global basis because his companies would remain in the United States but there would be no corporate tax assessed.[7]

17.   Richard engaged the services of his financial planner, Gary Hatch, and an attorney, Richard Bourne-Vanneck, to seek advice on how to participate in the EDC Program.

18.   Following meetings with these advisors, Richard began looking for commercial property in the Virgin Islands.  He planned to use the properties to launch a nanotech research company and an internet access device manufacturer.

19.   Richard testified he ultimately secured commercial space at Buccaneer Mall, in the Havensight area of St. Thomas, for a term beginning January 1, 2002.  No written lease was executed for this property.[8]  He also had discussions with the University of the Virgin Islands

---

allege they all unanimously agreed to make the Virgin Islands their residence at that time.  This Court does not credit this testimony, as discussed further below.

[7] None of the parties presented evidence regarding whether an investor must himself be a resident of the Virgin Islands to participate in the EDC Program, or whether, as is more likely, program eligibility is solely dependent on the company's presence and investment in the Virgin Islands economy.  Accordingly, Richard Vento's intent to participate in the EDC Program does not necessarily indicate he personally intended to reside in St. Thomas.

[8] Richard testified a lease was signed for this property, but no such lease was produced and his attorney, Edwin Robbins, Jr., admitted he was not aware of the existence of any written lease.  Tr. vol. 1, 142-43.  Thus, Richard's testimony on this point is not credible.

about creating a collaborative relationship in which Richard's proposed companies would help the university develop a physics department and the university would become a source of employees for the companies.

20.   In May 2001, Richard formed Virgin Islands Microsystems, a Virgin Islands company created to perform nanotechnology research.  In June 2001, Richard formed Edge Access, a Virgin Islands Corporation developed to build internet access devices.  In August 2001, Richard established VI Derivatives, LLC, a Virgin Islands LLC.  Ultimately, only one of these companies was approved to receive EDC benefits.[9]  This approval did not occur until sometime after 2001.

21.   Around the same time, while staying in an apartment in Red Hook, St. Thomas, Richard and Lana began searching for residential property on the island.  Their daughters were not involved in the search to buy a house in the Virgin Islands.[10]

22.   In May 2001, Richard and Lana executed a purchase contract for a residence at 17 Estate Frydendahl (the St. Thomas House), through VENTO, LLC, a company they owned,[11] for $7.2 million.[12]  The house was sold furnished, and the closing occurred on August 1, 2001.

---

[9] In his testimony, Richard did not specify which of the three companies ultimately received approval.  Tr. vol. 1, 59.

[10] The Ventos' realtor, Rosie Nichols, explained she first met the Vento daughters in December 2001, when they were in the Virgin Islands "visiting for the holidays."  Tr. vol. 1, 256.

[11] The purchaser was later changed to VI F.F.O., LLC, an entity organized by Richard and Lana under the laws of Nevada in July 2001.  VI F.F.O.'s purpose was to "acquire, own, hold, improve, manage, lease, develop, mortgage, sell, and otherwise deal with real property."  Ex. 19, at 4.  Each of the Vento daughters owned 33% of VI F.F.O., and Richard and Lana each owned 0.5%.

[12] This price was later reduced after the inspection report revealed the house needed significant improvements.

23.     On August 2, 2001, Lana signed a Rental Lease Agreement for the St. Thomas House as both

Landlord and Tenant.  The Lease Agreement stated that VI F.F.O., LLC agreed to rent the

St. Thomas House to Lana for a one-year period from August 1, 2001, to July 31, 2002, for

$1500 per month.

24.     Also in August 2001, the Ventos hired Liz Vaughn to serve as an office manager for

Richard's Virgin Islands businesses.  Vaughn created checking and payroll accounts for the

these companies.  When she was first hired, Vaughn paid business expenses and the Ventos'

local bills from her personal bank account.  Later, in April 2002, Vaughn set up a bank

account for Richard's local businesses.

25.     On August 6, 2001, Lana filled out an application to obtain Virgin Islands telephone service

at the St. Thomas House.

26.     The St. Thomas House was built in the 1950s.  It consists of one main house and several

outlying buildings; including three cottages with two bedrooms and a kitchen in each.  At the

time the property was purchased, the main house had five bedrooms.

27.     At the time the Ventos purchased the home, the sellers were living in some of the outlying

buildings, but the main house was vacant.

28.     Although both Richard and Lana assert they moved to the Virgin Islands on August 2, 2001,

the day after they finalized the purchase of the St. Thomas House, they spent a significant

amount of the period between August 2, 2001, and December 31, 2001, outside of St.

Thomas.   Richard left St. Thomas before August 15, 2001, and did not return until

approximately November 10, 2001.[13]  Lana left St. Thomas before August 18, 2001, and did

not return until approximately November 6, 2001.[14]

29.    When the Ventos purchased the St. Thomas House, they hired a professional home inspector,

whose report revealed extensive repairs would be required to make the property safe and

inhabitable.  Ex. 25a; Ex. 25b.  The home inspector's report stated that although there were

"no major structural deficiencies on the property," the house needed extensive renovation

---

[13] A review of the 2001 Year-End-Summary for Richard's American Express cards demonstrates how little time he spent in the Virgin Islands during the second half of 2001. Between August 15, 2001, and November 7, 2001, Richard used his American Express Gold card to pay for lodging in California, Hawaii, Florida, Arizona, and Texas.  Between August 9, 2001, and October 24, 2001, he used his American Express card at 12 restaurants in or near Lake Tahoe and in northern California.  Eight of these meals were purchased in Incline Village or other Lake Tahoe-area towns near the Ventos' Incline Village House.  The remaining four meals were purchased in towns within six hours drive of the Ventos' Incline Village House.  From October 24, 2001, to November 5, 2001, Richard also authorized four charges at restaurants in Boulder, Colorado, San Diego, California, and Austin, Texas.

In addition to these charges for food and lodging, Richard made numerous purchases outside the Virgin Islands between August and November 2001. From August 21, 2001, to August 23, 2001, Richard made purchases in Honolulu, Hawaii.  Between September 6, 2001, and November 6, 2001, he made purchases in Maryland, Nevada, Virginia, California, Hawaii, and Utah.  Richard's charges for St. Thomas restaurants occur only during the period from November 17, 2001, to December 30, 2001, although it appears he was not present in St. Thomas during that entire period because he paid for a car rental in Dallas, Texas, on November 18, 2001.

[14] Lana's American Express bill also shows she was rarely in the Virgin Islands during the second half of 2001.  From August 18, 2001, to October 30, 2001, Lana made purchases in California, Hawaii, Nevada, and Italy.  Her purchases at various stores reveal she was in Hawaii from approximately August 24, 2001, to August 31, 2001.  Between September 11, 2001, and September 26, 2001, Lana made purchases in Northern California.   It appears she traveled to Italy from around September 28, 2001, until around October 6, 2001, after which she traveled to Hawaii, Incline Village, Northern California, and Reno, Nevada, before returning to St. Thomas around November 6, 2001.  It appears Lana remained in St. Thomas until approximately December 4, 2001, when she again traveled to Hawaii.  She authorized further charges in the Virgin Islands between December 8, 2001, and December 12, 2001, and then authorized credit card charges in Incline Village, Sausalito, California, West Los Angeles, and Sacramento between December 13, 2001, and December 19, 2001.  From December 23, 2001, until December 31, 2001, Lana authorized charges in St. Thomas.

and upgrades.  Ex. 25a.  The inspector found that "all the structures suffer from deferred maintenance to varying degrees," and that repairs were needed to fix cracks in the walls, chipped concrete columns, leaks and sags in the roof, rusty electrical elements and hot water tanks, and non-functioning appliances in the kitchen.  *Id*.  At least $50,000 to $64,000 worth of repairs were necessary to make the residence safe and functional.  Ex. 25b.  The inspector was particularly concerned about the electrical system in the house, noting "[t]here is no GFI protection anywhere."  GFI protection, which prevents electrocution and fires caused by faulty wiring by interrupting an electrical current during periods of abnormal activity, is used as a safety precaution.[15]

30.    When Richard asked Lana what parts of the home she wanted to keep, she said only "the rock walls and the lignum vitae floor." Tr. vol. 1, 135.  When Richard was asked if they had to redo the entire house, he replied, "Yeah, roof, put in air conditioning, electricity, plumbing, everything." *Id.*

31.    On November 30, 2001, Richard Vento signed an agreement with R. R. Caribbean, Inc., a general contracting firm, for improvements to the St. Thomas House.  The agreement "create[d] a baseline contractual relationship" between the contracting firm and the Ventos, but it did not specify any particular work which was to be done.  Ex. 31.

32.    Although R. R. Caribbean may have performed some minor construction work in 2001, the major construction work on the St. Thomas House did not begin until 2002.

_____

[15] In a letter to representatives of the sellers of the St. Thomas House, the Ventos' real estate agent noted that safety was a primary concern because the buyers "expect[ed] to have many guests, including numerous grandchildren."  Ex. 25b.  It is noteworthy the agent did not refer to any grandchildren as residents of the St. Thomas House, but merely called them "guests."

33.   The Ventos had initially hoped the renovations could be completed in time to move into the

main house for Christmas in 2001.  By late fall of 2001, the Ventos had grown so frustrated

with the lack of progress that Lana traveled to Hawaii to hire Dave Thomas, a construction

manager and renovation specialist who had previously worked for the Ventos in Hawaii, to

organize work on the St. Thomas House.

34.   Lana told Thomas the St. Thomas House was dilapidated and needed "a whole lot of work"

to renovate it.  Tr. vol. 2, 225-26.  She asked Thomas to come to the Virgin Islands and

supervise renovation of the main house, the three cottages, and the supporting infrastructure.

35.   Thomas stated the Ventos were excited about their purchase of the St. Thomas House and

intended to eventually use it as their principal residence.[16]

36.   Thomas traveled to St. Thomas to view the property in December 2001.[17]

37.   As of December 2001, the main house was "50 percent liveable," but the amenities did not

work properly or consistently.  Tr. vol. 2, 234.  There was some electricity, lights, and a

stove, but some of the toilets did not flush, and the property did not have an adequate power

supply to run the electricity.  For example, although Lana wanted air conditioning in the

house, Thomas said the St. Thomas House did not have a sufficient power supply for air

conditioning.  Due to the lack of air conditioning and because the ceiling fans did not work

---

[16] Given the close financial and personal relationship between Thomas and the Ventos, Thomas's
testimony about whether the Ventos intended the Virgin Islands to be their primary residence is not
credible.

[17] The facts regarding the condition of the property in December 2001 are based primarily on the
testimony of Thomas, who testified at trial by video deposition because he currently resides in
Indonesia.  This Court finds Thomas's testimony regarding this issue credible because it was not
impeached and he had ample opportunity to observe the St. Thomas House during the relevant time
period.

properly, the house was very warm.  The entrance gate did not work, so the Ventos could not enter or exit their property until the gate was fixed.  The dock was dilapidated and "very dangerous," and the railings along steep areas of the property were beyond repair and needed to be completely replaced.  Tr. vol. 2, 235.  Moreover, the St. Thomas House lacked a reliable supply of drinking water because the reverse osmosis system, which converts salt water into fresh water, did not work and could not be fixed by the end of 2001.  The rain catchment systems and cisterns had peeling paint, missing grates and screens, and frogs living inside them such that the water from these sources "was not drinkable at all."  Tr. vol. 2, 235.[18]  Due to these problems with the water supply, anyone staying at the St. Thomas House had to drink and cook with bottled water.

38.    Overall, Thomas felt Lana did not understand the extent of the work that needed to be done on the house because, "the infrastructures [of the buildings] were all in shambles."  Tr. vol. 2, 227.  He described his construction work as a "total rehab" and noted that the Ventos were still working on improving the house as of the date of his deposition, more than eight years after he was hired.  Tr. vol. 2, 240.  As for the condition of the outlying buildings, Thomas stated, "The three attendant cottages were unliveable.  Pretty much, flat out."  Tr. vol. 2, 234-36.  In sum, "the whole house was marginal" as of December 2001.  Tr. vol. 2, 237.

39.    Since the Ventos purchased the St. Thomas property in 2001, it has constantly been under construction.  It was not liveable until Christmas 2003.[19]

---

[18] Thomas elaborated on the condition of the cisterns, saying he couldn't believe how terrible they were and describing the water as so bad he did not want to even shower in it, much less drink it.

[19] Thomas began working on improving the house in January 2002.  He remained in St. Thomas to work on the project for more than two years.  During this time, he lived on the property, first in the

40.     In advance of a Christmas party held in December 2001, efforts were made to prepare the St. Thomas House.   The day the purchase of the St. Thomas House closed, Lana began furnishing certain rooms.   She purchased linens and towels at Kmart, and purchased household furnishings, appliances, and furniture at various stores in the Virgin Islands and Puerto Rico.   Beginning in August 2001, Lana Vento ordered furniture and decor for the house from Toni Jackson at Silk Greenery and from Macy's in San Juan, Puerto Rico.  Vento told Jackson she was eager to furnish the house because she was expecting company for Christmas.

41.     Gail, Renee, and Nicole were not involved in furnishing the St. Thomas House.  Although Lana purchased several pieces of furniture from Jackson and asked Jackson to decorate the house  for Christmas, Jackson did not see the Vento daughters until the Christmas holiday in 2001.

42.     On November 17, 2001, the Ventos ordered a pool table from Toni Jackson.  They wanted it delivered before Christmas 2001.

43.     Lana Vento purchased Christmas decorations for the St. Thomas House in 2001, and paid Jackson to decorate the house.  Lana also paid to have her Incline Village House decorated for Christmas in 2001.

---

main house and then in the renovated guardhouse.  In addition to Thomas, Richard and Lana hired Lars Lindquist of Serenity Builders to undertake some of the improvements to the property.  They also hired Boschulte Landscaping to landscape the St. Thomas House.  Thomas repaired the cottages first so Richard and Lana would have a place to stay when they were in St. Thomas, while he and his crew essentially demolished and rebuilt the main house.  As part of the major renovations, the roof of the main house was replaced.  After a significant amount of work, the house was "up and running" in Christmas 2003, Tr. vol. 2, 231, although work has continued through 2009.

44.    The Ventos brought very little personal property to the St. Thomas House.[20]

45.    For the Christmas holidays in 2001, Richard and Lana invited 17 members of their family to the St. Thomas House.  Richard and Lana Vento, and their daughters Nicole, Gail, and Renee all spent Christmas 2001 at the St. Thomas House.

46.    Richard and Lana also paid for Lana's brother, Raleigh Pribanich, his wife, Virginia, and their children, Matthew, Darcy, and Wendy, to fly from California to St. Thomas for the Christmas holiday.  Virginia Pribinach left St. Thomas on January 2, 2002, and had never returned to visit the Ventos as of June 16, 2009.

47.    Pribanich took many photographs of the family members and their guests over the Christmas holiday, between December 25, 2001, and January 1, 2002.  Several of these pictures were taken for the purpose of portraying the Vento family as residents of the Virgin Islands as of December 2001.[21]

─────────────────────

[20] When asked what personal property he brought to the Virgin Islands in connection with this move, Richard said, "[n]ot very much.  Swimming suits, you know, basically summer clothes, one tuxedo for some of the charity events; clothing, you know, there was a lot of clothing."  Tr. vol. 1, 60.

[21] This conclusion stems from the unusual circumstances surrounding the pictures, including the fact the Ventos paid for all of the members of the Pribanich family to attend their Christmas party and gave the Pribanich family significant amounts of money near the end of 2001 and beginning of 2002. During the three-month period from November 2001 to January 2002, Richard and Lana made cash gifts to the Pribanich family totaling $200,000.  While Virginia Pribanich claimed to not remember these payments, she admitted during cross-examination that each of her five family members received $20,000 from the Ventos in November 2001, divided into two checks of $10,000 each, and an additional $20,000 divided in the same manner in January 2002.  Tr. vol. 2, 241-44.  Beyond these gifts, Virginia Pribanich was employed by the Dick and Lana Charitable Support Organization in 2002 and received a  salary from an organization managed by Richard and Lana, VISO Services, LLC.  In 2002, she was paid more than $20,000; in 2003, she was paid more than $50,000; and in 2004 she was paid more than $70,000.  The Ventos also employed Virginia's son, Matthew, and paid the college tuition for the Pribanichs' children.  At a minimum, these facts show Pribanich's testimony is biased due to her close financial relationship with the Vento family.  At most, the large cash gifts to the family around Christmas 2001 and the fact the Pribanich's *sole* trip to the Virgin

48.     Gail's then-boyfriend, Eric Walker, did not travel to St. Thomas for Christmas.  He only traveled to St. Thomas once in 2001 and, aside from the Christmas trip, did not recall a time when Gail traveled to St. Thomas without him in 2001.

49.     After Christmas, Nicole returned to Incline Village, Nevada, on December 26, 2001, with her husband and their three children.  The other Vento family members and their guests stayed in St. Thomas until New Year's Eve.

50.     Following the Christmas party, Jackson took down, packed up, and stored the Christmas decorations from the St. Thomas House.  After the 2001 Christmas holiday, the furniture located in the main house, which Lana had purchased from Jackson, was moved to one of the cottages.

51.     Although Richard owned more than 20 cars, he and Lana would rent cars when they were in St. Thomas.  In October 2002, Richard shipped a single vehicle to the Virgin Islands, a

---

Islands occurred at the end of 2001 suggest the Pribanichs willingly aided the Ventos in their attempt to appear to be Virgin Islands residents as of December 31, 2001.

Moreover, the nature of the pictures of the St. Thomas House taken by Pribanich seem designed to show the small sections of the house Lana had furnished while hiding the ongoing construction work at the Vento residence.  Exterior photographs of the house are limited to one wide-angle shot of the back of the main house and two photos of the outdoor patio.  No pictures of the three outlying houses were taken.  Instead, the bulk of these photographs show the interior rooms of the house, primarily the living room and dining room area.  The photographs of the interior depict the TV room, a corner of the dining room, the floor of the living room and several angles of the dining room table.  There are no pictures of the unfurnished kitchen, any of the bedrooms, bathrooms, or the other facilities on the property.  The remaining photographs show the Vento family sightseeing and relaxing around St. Thomas.

Finally, these circumstances must be analyzed in light of the fact Richard was aware of the importance of documenting his family's trip to the Virgin Islands.  On the Mollison family's itinerary of their December 2001 travel to St. Thomas, Richard wrote a note instructing an employee of the family to save itineraries for all Vento family members "to prove we spent time in St. Thomas."  Ex. 137.

minivan, leaving his 19 other cars in Nevada and California.

52.    The Ventos did not transfer their $500,000 art collection to St. Thomas.  Instead, when they

       sold their Incline Village House in 2001, they put the artwork into storage in Nevada.  In

       June 2010, most of the artwork remained in storage, but some pieces were moved into the

       Ventos' home in Lake Tahoe.  None of the artwork was moved to St. Thomas.

53.    The Ventos did not have a post office box registered for the receipt of personal mail, despite

       the fact mail service was not available at the St. Thomas House.[22]

54.    On December 31, 2001, Richard and Lana Vento sent a fax to their financial planner at

       Salmon Smith Barney directing him to change the titles and Tax ID numbers for the

       following accounts:  Nicole Vento, LLC; Gail Vento, LLC; Renee Vento, LLC; DTLV, LLC;

       and DTDV, LLC.  These entities, all of which were controlled by Richard and Lana, had held

       and sold OSI stock in January 2001.  The fax directed the financial planner to change the

       address for the accounts to a location in St. Thomas by December 31, 2001, and stated,

       "Your immediate attention to this matter is greatly appreciated."  Ex. 167.

55.    By instructing his broker to change the names and numbers of these accounts to V.I.

       Derivatives, LLC, Richard ensured that his broker would not send 1099 forms to the IRS

       reporting that the Vento family and entities they controlled had earned more than $150

       million from the sale of OSI stock in 2001.  Instead, the stock gain was reported as having

       been realized by V.I. Derivatives, LLC, a company which did not exist when the stock was

---

[22] On June 21, 2001, Richard registered a P.O. Box in Red Hook, St. Thomas, on behalf of V.I.
Semiconductor Labs, Inc.  Vento testified this P.O. Box was necessary because mail service was not
available at the St. Thomas House.  The application for this P.O. box, however, reveals it was not
made on behalf of Richard as an individual, but was made on behalf of a corporate entity.

sold.

56.     Because the stock was reported as realized by V.I. Derivatives, LLC, the income from the

        stock was reported to the Virgin Islands Bureau of Internal Revenue (BIR), not the Internal

        Revenue Service (IRS), pursuant to 26 U.S.C. § 6045.

57.     In addition to ensuring these titles and Tax IDs were changed by the close of 2001, Richard

        and Lana hired McKenzie Smith to create a charitable organization and a Virgin Islands

        Limited Liability Company by the end of 2001.[23]

**RICHARD AND LANA VENTO**

58.     In October 2000, Richard and Lana listed the Incline Village House for sale with a local

        realtor.  Their sale of this property was contingent on the Ventos entering into escrow for the

        purchase of a 2.2 acre property on the north shore of Lake Tahoe, 1021 Lakeshore Boulevard

        (Incline Village Property).

59.     In May 2001, after the family vacation in the Virgin Islands but before they acquired any

        Virgin Islands property, Richard and Lana Vento purchased the Incline Village Property for

        approximately $13.5 million.[24]  At the time of their purchase, the property contained a small

        two-bedroom cottage, described by Gail as "semi-habitable."  Tr. vol. 2, 27.

_____

[23]  This arrangement is confirmed by a letter sent by McKenzie Smith to Richard and Lana on
December 21, 2001, outlining a number of services the firm would perform for the Ventos before
the end of 2001, including creating a Support Organization and a Virgin Islands Limited Liability
Company.  To complete the various listed services, McKenzie Smith charged the Ventos $150,000
and included a note stating, "So that we can complete the above entities during the 2001 Calendar
Year, Payment is Due Upon Receipt."  Ex. 190.  The evidence shows, however, that the charitable
support organization was not actually set up until 2002.

[24] This amount is almost twice as much as the Ventos paid for the St. Thomas House, which they
purchased the same year.

60.     The Ventos intended to build a home on the Incline Village Property, and met with builders and architects to discuss this project.  They told their friends and family they planned to build a home on the lot.[25]

61.     On June 29, 2001, the Ventos received a letter from Incline Village asking if they intended to renew their membership in the recreation center.  The Ventos purchased a year-long "family resident" membership.

62.     By December 2001, the Ventos still had not sold the Incline Village House.

63.     The Ventos calculated the tax savings available to them depending on whether they sold or donated the Incline Village House.   They discovered they would save money by donating the house, rather than selling it.[26]

64.     On December 23, 2001, Richard and Lana sent a letter to real estate agent Victor Lockhart of Chase International.  The letter read, "Dear Victor: Please take our house at 889 Lakeshore Blvd., Incline Village, NV off the market.  I have explained our plans over the phone and will talk to you in January."  Ex. 218.   These plans included donating the Incline Village House to the Dick and Lana Charitable Support Organization (Support Organization)[27] before

---

[25] Richard told several friends he wanted to build a house on the lot as well as a tennis court with a 22-car garage underneath, stating, "Everybody knew what my plans were for that lot."  Tr. vol. 1, 170-71.

[26] Without donating the house to a charitable organization, the Ventos would be required to pay tax on the gain in value of the Incline Village House upon its sale.  By donating the house to the a charitable organization, however, they believed they would save $1.7 million in taxes and be eligible for a $12 million tax deduction.

[27] Although the circumstances of the Support Organization's creation are not directly relevant to the residency issue currently before this Court, such circumstances do relate to the location of Richard and Lana during 2001 and 2002.  Moreover, these circumstances bear on the issue of credibility of Richard and Lana.  Despite Richard and Lana's testimony the Support Organization was created in

the property was sold to save money on the Ventos' income taxes.

65.     On December 28, 2001, Richard and Lana transferred the Incline Village House by quitclaim deed to the "Dick and Lana Charitable Support Organization."[28] Ex. 178. At the time of this purported transfer, the Support Organization did not exist because its formation documents were not signed until March 2002. The quitclaim deed listed the address of the Support Organization in St. Thomas, Virgin Islands.

66.     The quitclaim deed includes an acknowledgment by a Notary Public in Salt Lake City, Utah,

---

2001, it was not officially formed until March 6, 2002, when Richard and Lana filled out a Certificate of Trust and a Declaration of Trust in Washoe County, Nevada. The Declaration of Trust purported to establish a charitable organization governed by §§ 501(c)(3) and 509(a)(3) of the Internal Revenue Code, and governed by the laws of Utah. The Declaration and Certificate of Trust are in conflict as to the date of the Organization's formation. The Certificate states the Dick and Lana Charitable Support Organization was created on December 28, 2001. The Declaration of Trust, in contrast, asserts the Declaration was made on July 10, 2001. Both documents were signed on March 6, 2002, which this Court finds was the date of the formation of the Support Organization.

The Certificate appointed Richard and Lana Vento as Co-Trustees of the Support Organization. On December 28, 2002, by "Unanimous Consent of the Co-Trustees of the Dick and Lana Charitable Support Organization," the Support Organization accepted a $12 million donation from Richard and Lana. Such donation was approved by the signatures of Richard and Lana. Two days later, Richard wrote a letter addressed to himself and his wife which read, "Dear Dick and Lana: This letter is to thank you for the generous donation that was recently received by this organization. Your continuing support and generosity are greatly appreciated." Ex. 186. The letter continued:

> As we discussed earlier, the cash donation from the sale of your home will allow us the flexibility that we were looking for. The offer of the home itself as a donation was intriguing, but as you are aware we could not use the property for the benefit of the Organization. The sale proceeds can be readily put to use in our charitable activities. Thank you again, and we look forward to our future endeavors. Very truly yours, Richard G. Vento, Co-Trustee.

*Id.* Whether this house was truly donated by the Ventos to a legitimate charitable organization is the subject of other litigation between the Ventos and the IRS.

[28] The quitclaim deed lists the value of the property at $12 million. The house was transferred by quitclaim deed for no consideration.

which is also dated December 28, 2001, stating the notary witnessed the Ventos sign the deed.  This statement directly conflicts with the Ventos' testimony that they were present in St. Thomas on December 28, 2001.   The notary public was Chris Rawlings, an employee of Gary Hatch, the Ventos' financial planner.[29]

67.    The first time the Ventos tried to record the quitclaim deed, the Washoe County, Nevada, Recorder of Deeds refused to record it because the Ventos submitted a faxed copy instead of the original document.

68.    On their 2001 Virgin Islands income tax return, Richard and Lana claimed a deduction in excess of $12 million for the donation of their Incline Village House to the Support Organization.

69.    Lana completed a Form 990 tax return for the Support Organization for 2001.  The Support Organization did not report its receipt of the Ventos' Incline Village House.

70.    In January 2002, an employee of Richard and Lana sent a check for $25,000 to the IRS as prepayment of the Ventos' taxes for the fourth quarter of 2001.

71.    Richard and Lana Vento purchased homeowner's insurance for their Incline Village House for the 2001 and 2002 calendar years.  The insured parties listed on the policy for the 2002 calendar year are Richard and Lana Vento, not the Dick and Lana Charitable Support Organization.

72.    More than $3 million worth of Richard and Lana Vento's personal property remained in the

---

[29] Given the wealth of evidence showing the Ventos were in St. Thomas between Christmas and the end of 2001, and the fact the notary worked for the Ventos' financial planner, it is likely that this deed was improperly notarized because the notary public could not have personally witnessed the Ventos' signing of the deed.

Incline Village House after they claimed they donated the home to the Support Organization. This property stayed in the home until it was sold in March 2002.

73.     Before the sale of the Incline Village House could close, the title company required the Ventos to produce evidence that the Dick and Lana Charitable Support Organization – the purported title holder on the property – actually existed.  The documents related to the formation of the Support Organization were signed the same month as the sale of the house, March 2002.

74.     In April 2002, Richard and Lana bought a furnished two-bedroom condominium in Incline Village, Nevada (Incline Village Condominium).  They purchased the Incline Village Condominium in the name of the Dick and Lana Charitable Support Organization. Following this purchase, Richard and Lana leased the condo from the Support Organization for $3500 a month for three years, although the Ventos paid no rent on the condominium for the first four months of the lease term.[30]

75.     On April 10, 2002, the Support Organization held an advisory board meeting which  Lana attended.  Minutes of the meeting reveal there was a discussion about Richard and Lana's purchase of the Incline Village Condominium.  The notes show the Ventos closed on April 26, 2001, issuing a check for the condominium's deposit from the Support Organization's bank account, and that Richard and Lana "[w]ill live in the condo until the new house is built."  Ex. 144.  The "new house" refers to the house Richard and Lana planned to build on

--------

[30]On May 30, 2002, Richard sent an email in which he said Lana and Nicole were responsible for setting the rent for the condominium.  Nicole advised that the rent should be $3500.  Ex. 146.  On August 26, 2002, Lana Vento signed a check for $14,000 to the Dick and Lana Support Organization, purportedly to pay for rent from June 2002 to September 2002.

their Incline Village Property.  Richard and Lana planned to live in the Incline Village Condominium until their new house was constructed on the Incline Village Property.

76.    In 2002, the Ventos paid $2000 to replace carpeting and vinyl in a structure on the Incline Village Property.

77.    Richard and Lana's discussions regarding building a new house on the Incline Village Property continued until June 2007, when the Ventos abandoned their plan to build a house on this property.

78.    Despite their continuing ties to their Nevada community, Richard and Lana acquired Virgin Islands driver's licenses in 2001.[31]  Richard and Lana both registered to vote in the Virgin Islands in the fall of 2001.[32]

79.    The Ventos did not establish a bank account in the Virgin Islands until April 2002.

80.    On January 6, 2002, Richard and Lana returned to Incline Village from St. Thomas and stayed in the Incline Village House.  Lana stayed there until at least February 6, 2002.[33]

81.    Richard and Lana maintained a membership at the Incline Athletic Club in Incline Village for 2002.

---

[31]  Lana acquired her Virgin Islands driver's license on December 11, 2001, but even after receiving this license she retained her Nevada driver's license.  Richard testified he first acquired a Virgin Islands driver's license in August 2001, but the first license he could produce was issued in 2005.  Although he presented no evidence of his receipt of a license that year, this Court will credit his testimony on this limited issue because it comports with his and Lana's other numerous efforts to appear to be Virgin Islands residents as of December 31, 2001.

[32] Lana registered to vote in the Virgin Islands in August 2001, and Richard registered in September 2001.

[33]  Personal checks written by Lana establish that she was in Incline Village during this period.  On January 12, 2002, and February 6, 2002, she had her hair done in Incline Village.  In the interim period, Lana wrote several other checks which appear to have been issued while she was in Nevada.

82.     After the Christmas party in 2001, Richard and Lana returned to St. Thomas only sporadically.  From 2002-2004, Lana was at the property more than anybody else because she was directing the construction efforts.  Lana would visit the house for between one and six weeks at a time, and then would leave for another six weeks.

83.     During 2002, Richard was present in St. Thomas less often than Lana.  During the first five months of 2002, Richard spent 35 days in St. Thomas, 23 days in San Francisco, and 41 days in Nevada.

84.     Richard was involved in two motor vehicle incidents in the spring of 2002, both of which occurred in California.  In March 2002, Richard was in a car accident in San Francisco.  The following month, on April 21, 2002, he was arrested and issued a traffic citation in Truckee, California, a town just over the state line from Incline Village, Nevada.

85.     On the day Richard Vento sent the IRS his 2001 tax form, in which he purported to be a Virgin Islands resident, he was at his home in Hawaii.  Richard and Lana continue to own two homes in Maui, which they visit regularly.[34]

**NICOLE MOLLISON**

86.     Nicole Mollison is the eldest daughter of Richard and Lana Vento. On December 31, 2001, she was 29 years old.  She is married to Peter Mollison.  The Mollisons have four children, SM (born in 1992), BM-1 (1998), BM-2 (2000), and AM (2003).

87.     In 1995, the Mollisons moved into a home at 648 Martis Peak in Incline Village, Nevada (Nevada Home).  The home was titled to Nicole Vento, LLC.

---

[34] Indeed, in another legal dispute with the IRS, in which he contests IRS deficiency notices for two companies, Richard has requested Honolulu, Hawaii, as the place of trial.

88.  The Mollisons hired contractors to do remodeling work on their Nevada Home during 2000, 2001, and 2002.

89.  As of October 15, 2001, the Nevada Home was the Mollisons' primary residence.[35]

90.  The Mollisons lived in their Nevada Home until 2006, when they moved to their current home at 110 Crane Drive, San Anselmo, California (California Home).

91.  The Mollisons kept their possessions in their Nevada Home from the time they purchased it until they moved to their California Home.  The Mollisons never moved any of their possessions to the Virgin Islands.

92.  The Mollisons kept their pets at their Nevada Home.  Nicole also kept her father's dog, Hoover, at the Mollison's Nevada Home.

93.  The Mollisons and their children visited St. Thomas three times during the second half 2001.[36]  On each visit, they stayed at the St. Thomas House and engaged in tourist activities. During 2002 and 2003, the Mollisons "would come and go, but just a few times, [and] they weren't living there."  Tr. vol. 2, 243-44.

---

[35] On October 15, 2001, the Mollisons filed a joint federal income tax return with the Internal Revenue Service for 2000, reporting to the IRS that they were currently living in Incline Village, Nevada.

[36] The Mollison family traveled from San Francisco to St. Thomas from September 29, 2001, until October 5, 2001.  On October 5, 2001, the Mollisons left San Francisco and traveled to Hawaii, where they stayed for 12 days.  They traveled to St. Thomas again from November 3, 2001, until November 12, 2001, and from December 18, 2001, to December 26, 2001.  There is a handwritten note on the Mollisons' December itinerary written by Richard which says, "To prove we spent time in St. Thomas, keep a file of each of my family members['] trips to [and] from USVI, (St. Thomas) for 2001."  Ex. 137.

94.     At the end of 2001, Nicole Mollison did not have a Virgin Islands driver's license.[37]

95.     In October 2001, Mollison acquired a new car which she kept in Incline Village, Nevada.

96.     On December 26, 2001, after spending Christmas in St. Thomas, the Mollisons returned to their Nevada Home.

97.     For the 2001 tax year, based on the advice of a third party, Nicole Mollison filed an income tax return with the Virgin Islands BIR, claiming a filing status of "married filing separately" and listing her address as a mail drop in Red Hook, St. Thomas.

98.     Peter was not advised to file his tax return in the Virgin Islands in 2001; instead, he filed a return claiming the status of "married filing separately." On his 2001 tax return, he listed his "home address" as 865 Tahoe Boulevard, Incline Village, Nevada, where the Ventos' home office is located. Peter and Nicole have never been separated since they wed in 1996.

99.     The Mollisons never moved to the Virgin Islands during 2001, or any time thereafter.[38]

100.    During 2001 and 2002, Peter worked in the Lake Tahoe area for the Incline Village General Improvement District.

---

[37] Although Nicole claimed she attempted to secure a driver's license in 2001, she did not actually obtain a Virgin Islands driver's license in 2002. Tr. vol. 1, 282-83.

[38] Although Nicole testified she and her family moved to the Virgin Islands in 2001, her testimony was not credible given her evasive demeanor on cross-examination, her family's continuing ties to Nevada (including her husband's uninterrupted Nevada residency between 1995 and 2006), and the lack of safe and comfortable accommodations for the Mollison family at the St. Thomas House. Nicole stated she and her husband moved their three children from a single-family home in Incline Village to a two-room suite in the St. Thomas House. The contention that a five-person family with ample financial resources would leave a house which accommodated them comfortably and move into a two-room suite strains all credulity, especially in light of the home inspection report's conclusion that the St. Thomas House had serious safety issues for children, including electrical sockets without GFI protection and walkways without railings or fences which were next to steep drop-offs into the ocean. Nicole did not provide a convincing reason for agreeing to such a drastic change in living arrangements.

101. On January 1, 2002, the Mollisons applied to the Charitable Support Organization through an entity they owned, CalNev LLC, for a loan to purchase a rental house in Fairfax, California.  The loan application papers, which were faxed from Incline Village on January 1, 2002, stated the Mollisons' residence was in Incline Village, Nevada.  Both Mollisons signed the loan application, certifying that all the information in the application was true and indicating that such signatures were made under penalties of perjury.

102. In 2003, Nicole Mollison applied for admission to the Masters program in teaching at Sierra Nevada College in Incline Village, Nevada, where she studied to become a teacher.  She eventually became a teacher licensed to teach in Nevada and California.  Although Mollison took classes at the University of the Virgin Islands for a short time in 2004, she never became licensed to teach in the Virgin Islands.

103. Beginning in 2002, Nicole Mollison was employed by the Support Organization, which paid her $15 per hour.[39]

104. The Mollison children attended school in Incline Village, Nevada, at the end of 2001.[40]  The Mollison's eldest child, SM, was attending Incline Academy (also known as the Lake Tahoe School) in Incline Village, Nevada, in 2000.  In July 2001, after she purportedly decided to

---

[39] Although Nicole claimed this employment began in 2001, this testimony is not credible because she did not receive a Form W-2 from the Support Organization in 2001, but she did receive a W-2 the following year.  The minutes of the February 15, 2002, teleconference of the advisory board of the Support Organization discuss how the organization will begin to operate by developing a list of charities and contributing money to such charities.  The minutes further state that Nicole Mollison "may not be interested in working in St. Thomas because of her family obligations."  Ex. 143.

[40] Richard testified that Nicole's children, his grandchildren, attended school in Nevada at this time. Tr. vol. 1, 72.  This testimony is supported by the testimony of Lars Lindquist, a construction worker at the St. Thomas House, who stated Nicole told him in November 2001 that her children were enrolled in school in Lake Tahoe.  Tr. vol. 1, 227-28.

move to the Virgin Islands, Nicole applied for her second child, BM-1, to attend Incline Academy.  BM-1 began attending Incline Academy in August 2001.  As part of BM-1's enrollment, Nicole Mollison signed the school's parental consent forms allowing BM-1 to attend field trips and to be released to his grandparents, Richard and Lana Vento, for the 2001-2002 school year.

105.   Before May 2003, BM-2, the Mollisons' third child, attended preschool in Incline Village, Nevada, at Tahoe Tots.  When BM-2 was old enough to be enrolled in school, beginning in 2003, the Mollisons enrolled him at Incline Academy.

106.   From 2000 until the end of the 2005-2006 school year, the Mollisons' school-aged children attended Incline Academy full-time.  Nicole Mollison signed re-enrollment contracts and tuition agreements for her children to attend Incline Academy each year through the 2002-2006 school years.  Although Nicole enrolled her children at the Antilles School in St. Thomas in 2004, she withdrew the children after a few weeks and re-enrolled them at Incline Academy.[41]

107.   While her children attended the Incline Academy, Nicole Mollison volunteered at the school.

108.   In 2003, the Mollisons adopted their fourth child, AM.  In their adoption petition, both Nicole and Peter Mollison swore under oath that they were residents of Washoe County,

---

[41] Nicole's testimony on this point further shows she was not a credible witness.  On direct examination, she was asked whether her children ever attended school in the Virgin Islands and she responded, "Yes, they did . . . They attended school at Antilles . . . [which is] a private school here on the island."  Tr. vol. 1, 291.  She further elaborated that SM, BM-1, and BM-2 attended seventh grade, first grade, and preschool, respectively.  When asked about the time frame of her children's attendance, Nicole replied, "It was in 2004."  *Id.*  Neither Nicole nor her attorney clarified that the total time of the children's attendance was a mere six weeks.

Nevada, and swore they had maintained continuing residence there since 1995.[42]

109.    As part of the adoption process, a Nevada social worker visited the Mollisons' Nevada Home to determine whether it was an appropriate environment for an adopted child and whether the Mollisons were fit parents.  The Mollisons did not tell the Nevada court or the social worker that they lived in the Virgin Islands or maintained a residence in the Virgin Islands.

110.    In early 2004, the Nevada court granted the Mollisons' adoption petition.  As part of its approval, the Nevada court relied on the Mollisons' application, including their sworn statement that they had been residents of Washoe County, Nevada, since 1995.[43]

## GAIL VENTO

111.    Gail Vento is the second eldest daughter of Richard and Lana Vento.  On December 31, 2001, she was 25 years old.

112.    Gail began college in 1994 at Oregon State University.  She also attended Truckee

---

[42] Nicole testified that she swore she was a resident of Nevada because she wanted to take advantage of Nevada's 72-hour parental rights termination laws, whereby after three days the adopted child's birth parents would no longer have any right to custody or visitation of the child.  Far from being an adequate justification, this testimony only further undermines her credibility as it suggests a willingness to lie despite taking an oath to be truthful and a willingness to misrepresent her residency status in order to obtain the benefit of local laws which she feels are beneficial to her.

[43] The Order For Adoption states:

The Court, having examined the Petitioners under oath, from which examination the Court finds that all of the allegations of the Petition are true:  That the Petitioners are husband and wife, and that they were married on November 2, 1996, in Incline Village, Nevada; that Petitioners have maintained their place of residence together in Washoe County, Nevada, at all times since approximately 1995 . . . [it is ordered] that the minor child is declared to be adopted by the Petitioners, Peter Mollison and Nicole Mollison.

Ex. 140.

Community College in Reno, Nevada, and San Francisco State University.

113.   From 1998 until December 2002, Gail was enrolled as a full-time student at the University of Colorado in Boulder, Colorado.

114.   When Gail enrolled at the University of Colorado, her then-boyfriend, Eric Walker, moved to Colorado with her.

115.   In 2000, Gail bought a house at 388 Wagonwheel Gap Road in Boulder, Colorado (Colorado Home).  The house was 2800 square feet and had two bedrooms, three bathrooms, and a two-car garage on over six acres of land.  Gail and Walker lived there the entire time she was enrolled at the University of Colorado.

116.   During the time Gail and Walker lived in the Colorado Home, they devoted substantial time and resources to improving their residence.

117.   While Gail attended school full time, Walker worked at various construction jobs in the Boulder area. Walker established Colorado residency and paid Colorado income taxes.

118.   While attending the University of Colorado, Gail engaged in off-campus activities, including playing soccer, wakeboarding, boating, and skiing. Gail kept a boat owned by her parents in Boulder and incurred expenses maintaining the boat.  Following her college graduation, Gail moved the boat back to Incline Village.

119.   Gail visited St. Thomas two or three times in 2001.  She visited once in March for the family cruise which Richard claimed precipitated the entire Vento family's move to the Virgin Islands.  She also visited for Christmas 2001, during which time she stayed in a bedroom in the main house on the St. Thomas property.   Walker did not accompany Gail on the Christmas vacation, and only visited St. Thomas once in 2001.  The only personal possession

27

Gail brought to St. Thomas in 2001 was her clothing.

120.   During her trips to the Virgin Islands in 2001, Gail snorkeled, kayaked, shopped, went

sightseeing, and engaged in other tourist-type activities.  Following her trips to St. Thomas,

Gail returned to Boulder.

121.   During the summer of 2001, Gail attended a full-time summer geology field camp offered

by the University of Wyoming.

122.   In the fall of 2001, Gail visited doctors and dentists in Boulder.

123.   At the end of 2001, Gail did not have a Virgin Islands driver's license and had not yet

registered to vote in the Virgin Islands.[44]

124.   On January 4, 2002, Gail purchased red oak hardwood floors for her Colorado Home.

125.   Walker moved to St. Thomas in September 2002 to work on renovations at Richard and

Lana's St. Thomas House.  Gail remained in Boulder to complete her studies.

126.   She completed double majors in geology and mechanical engineering and graduated in

December 2002.

127.   Following her graduation from the University of Colorado, Gail sold her Colorado home and,

through an LLC, purchased a house at 590 Pinto Court, Incline Village, Nevada (Gail's

Nevada Home), in May 2003.  This home was a few minutes by car from the homes of

Nicole and her parents.  Gail and her husband kept furniture, tools, and other personal

possessions at this property.

128.   Gail "came and went" to the St. Thomas House during 2002, but she was not living there.

_____

[44] Gail did not acquire a Virgin Islands driver's license until sometime after 2001, and she registered
to vote at the same time she obtained a driver's license.

Tr. vol. 2, 244.

129.   In September 2003, Gail and Walker wed at the Incline Village Property Richard and Lana
       purchased in May 2001.

130.    Following their marriage in 2003, Gail and Walker moved into one of the cottages  at the
       St. Thomas House.  Sometime in 2008, the couple moved to a new home they purchased in
       Hull Bay, on the north side St. Thomas.

131.   In April and June of 2001, Gail Vento LLC issued checks to Gail for the purpose of paying
       her estimated taxes for 2001.  The amounts of these two checks were $145,000 and $50,000,
       respectively.

132.   On September 17, 2001, Gail Vento's LLC paid estimated income taxes of $50,000 to the
       United States Treasury for the 2001 tax year.  Tr. vol. 35-40; Ex. 202.   Lana Vento signed
       this check.

133.   Her parents did not claim Gail as a dependent in 2001.

**RENEE VENTO**

134.   Renee Vento is the youngest daughter of Richard and Lana Vento.  On December 31, 2001,
       she was 24 years old.

135.   On October 15, 2001, Renee filed her tax return for 2000 as a resident of Incline Village,
       Nevada.  Her parents did not claim her as a dependent for tax purposes in 2000.

136.   In June 2001, Renee earned a bachelor's degree from San Diego State University in
       California.

137.   Following her graduation, in June 2001, Renee took a trip to the Virgin Islands and stayed
       at a hotel on St. Thomas.  While in St. Thomas, Renee went scuba diving, swam, and

engaged in other tourist-type activities.  When she left the Virgin Islands, she returned to San Diego.

138.   The same summer, Renee took a vacation to Belize which lasted approximately two weeks. She also took vacations in 2001 to Costa Rica, Hawaii, and Italy.

139.   Renee traveled to St. Thomas again from September 13, 2001, to September 19, 2001, staying in a room in the main building of the St. Thomas House.[45]  During the trip, she went running, swimming, and surfing. When she left St. Thomas, she returned to her home at 244 Wassou, Crystal Bay, Nevada (Lake Tahoe Home).[46]  She did not return to St. Thomas until December of 2001.

140.   Renee was in St. Thomas for Christmas 2001, but returned to Nevada in early January 2002. The personal property she had in St. Thomas around this time included only easily movable items such as clothing, camera equipment, and a laptop.

141.   At the end of 2001, Renee did not have a Virgin Islands driver's license and had not yet registered to vote in the Virgin Islands.  Although she obtained a Virgin Islands driver's license in March 2002, Renee kept her Nevada driver's license as well.  At some point, she lost her Virgin Islands driver's license, but did not attempt to acquire a new one.  In 2005, Renee renewed her Nevada license.

142.   Renee also registered to vote in the Virgin Islands, although she has never voted in an

---

[45] When asked whether a particular bedroom in the main house was designated as hers, Renee replied, "I believe so, yes," and said her room was "downstairs, near what's now [the house's] gym." Tr. vol. 1, 342.  However, she was not certain whether this was the same room she stayed in when she returned to the Virgin Islands in December 2001.

[46] The Lake Tahoe Home was titled in the name of Renee Vento, LLC.

election in the Virgin Islands or the United States.

143.    Renee never opened a bank account in St. Thomas.

144.    From Summer 2001 to Spring 2002, Renee worked in her family's home office in Incline Village, Nevada.  She was paid around $14 per hour to perform administrative tasks.  During this time, Renee lived in a house at the Lake Tahoe Home, where she kept all or nearly all of her belongings.  She was not enrolled as a student anywhere until mid-2002.

145.    In January 2002, Renee applied for admission to the Brooks Institute of Photography in Santa Barbara, California (Brooks).  She mailed her application from Incline Village on January 14, 2002.  On the application, she listed her address as a P.O. Box in Incline Village, Nevada.

146.    Renee enrolled at Brooks in either March or June of 2002.  When she began school at Brooks, Renee lived in Carpenteria, California, where she rented an apartment and, later, a house.

147.    Renee owned a car which was registered in Incline Village, Nevada.  Renee used services from the American Automobile Association on four occasions in 2001 and 2002:  (1) on September 27, 2001, when her car had a dead battery while she was in Incline Village; (2) on January 30, 2002, when she was locked out of her car in Incline Village; (3) on February 2, 2002, when she was again locked out of her car in Incline Village; and (4) on June 20, 2002, when she was locked out of her car for a third time while in Carnelian Bay, near Lake Tahoe.

148.    Renee never transported her car to St. Thomas, nor did she ever purchase a car in St. Thomas.

149.    Renee was rarely at the St. Thomas House from 2002-2004, and when she was there, she

stayed for relatively short periods of time before returning to her home in Nevada.[47]

**DISCUSSION**

The issue before this Court is whether each member of the Vento family was a bona fide resident of the Virgin Islands as of December 31, 2001, such that he or she could legally avoid paying U.S. income tax.  The United States argues the Ventos were not bona fide residents of the Virgin Islands because they did not take sufficient action to demonstrate an intent to become Virgin Islands residents and did not abandon their prior residences in Nevada by the end of 2001.  The Ventos argue they have met the low threshold to become Virgin Islands residents because they were present in the Virgin Islands on the last day of 2001 with the intent to become residents.  Similarly, the Virgin Islands contends the Ventos' pattern of repeated travel to the Virgin Islands and their development of a residential property is sufficient to establish residency.

Congress created a new tax system for the Virgin Islands in 1921 to assist the Virgin Islands in becoming self-supporting.  *See HMW Indus. v. Wheatley*, 504 F.2d 146, 150 (3d Cir. 1974).  The legislation created a "mirror code" for the Virgin Islands which reflected the provisions of the federal tax code, except insofar as such provisions were incompatible with the Virgin Islands' tax structure. *Id.*  Section 932 of the Internal Revenue Code addresses coordination of United States and Virgin Islands income taxes.  Although it is has since been amended, in 2001, the relevant provision of this section read as follows:

In the case of an individual who is a bona fide resident of the Virgin Islands at the

---

[47] Two men working on the renovation of the St. Thomas House did not observe Renee often at the house.  Thomas said of Renee, "I didn't see much of her.  If she came down, she would stay ten days to two weeks and then leave and go back to Nevada." Tr. vol. 2, 242-43.  Lindquist did not see Vento on the property until 2002.  When he saw her, he did not know who she was.

> close of the taxable year and who, on his return of income tax to the Virgin Islands, reports income from all sources and identifies the source of each item shown on such return, for the purposes of calculating income tax liability to the United States gross income shall not include any amount included in gross income on such return.

26 U.S.C. § 932(c)(4) (2001).[48]  Accordingly, a taxpayer who was a bona fide resident of the Virgin Islands at the end of a year generally need not file a federal income tax return or pay income taxes to the United States for that year.  Section 932, however, draws a distinction between individuals who are *bona fide* residents of the Virgin Islands and individuals who merely earn income in the Virgin Islands, and requires a United States resident who receives income from the Virgin Islands to file a tax return with both the IRS and the BIR.  *See id.*  The term "bona fide" in 26 U.S.C. § 932(c) has been interpreted as "a synonym for truthful or honest."  *United States v. Auffenberg*, No. 07-47, 2008 WL 4115997, at *10 (D.V.I. Aug. 26, 2008); *see also* Black's Law Dictionary (7th ed. 1999) (defining bona fide as "[m]ade in good faith; without fraud or deceit" or "[s]incere; genuine").

Because there is little case law relating specifically to residency in the Virgin Islands for tax purposes, both parties rely heavily on a line of cases addressing residency in foreign jurisdictions under 26 U.S.C. § 911.  Under this body of law, a petitioner bears the burden of proof to show he is a bona fide resident of a foreign jurisdiction. *Lansdown v. Commissioner*, 73 F.3d 373, at *3 (10th Cir. 1995).  Both Petitioners and the United States agree this Court should apply the standard set forth in *Sochurek v. Commisioner*, 300 F.2d 34 (7th Cir. 1962), to decide whether Petitioners have met their burden to show they were bona fide Virgin Islands residents at the end of 2001.  In *Sochurek*, the Seventh Circuit found the petitioner, a Singapore-based foreign correspondent for Life

---

[48] Section 932(c)(4) has since been amended to require, *inter alia*, that the individual be a bona fide resident of the Virgin Islands "during the entire taxable year."

Magazine, was a bona fide resident of Singapore and was thus not required to report his gross income to the United States. *Id.* at 36. In making this determination, the Seventh Circuit held that, because the tax statute did not define the term "bona fide resident," residency status must be determined "on the basis of its own unique attendant circumstances." *Id.* at 37-8 (citing *Nelson v. Commissioner*, 30 T.C. 1151, 1153 (1958)). The court explained that in determining residency status, "one of the proper distinctions to be recognized is that of 'transients and sojourners on the one hand and residents on the other.'" *Sochurek*, 300 F.2d at 38 (citation omitted); *see also* Treas. Reg. § 1.871-2(B) (2001) (defining a resident as a person who is "actually present" and is "not a mere transient or sojourner"). In deciding where a petitioner falls in this spectrum, his or her "intentions with regard to the length and nature of his stay" are of primary importance. *Id.* Such intentions are "determined by considering the facts and circumstances of the case." *Preece v. Commissioner*, 95 T.C. 594, 609 (Tax Ct. 1990) (citing *Sochurek*, 300 F.2d at 37-38). The court noted, however, that the standard for establishing residence is "far less than [the standard] for determining domicile[,] which requires an intent to make a fixed and permanent home." *Sochurek*, 300 F.2d at 38 (citations omitted).

After reviewing a number of cases, the *Sochurek* court summarized the relevant subjective and objective factors which courts consider to determine residency:

    (1) intention of the taxpayer;
    (2) establishment of his home temporarily in the foreign country for an indefinite period;
    (3) participation in the activities of his chosen community on social and cultural levels, identification with the daily lives of the people and, in general, assimilation into the foreign environment;
    (4) physical presence in the foreign country consistent with his employment;
    (5) nature, extent and reasons for temporary absences from his temporary foreign home;
    (6) assumption of economic burdens and payment of taxes to the foreign country;

34

(7) status of resident contrasted to that of transient or sojourner;
(8) treatment accorded to his tax status by employer;
(9) marital status and residence of his family;
(10) nature and duration of his employment; whether his assignment abroad could be promptly accomplished within a definite or specified time; [and]
(11) good faith in making his trip abroad; whether for purpose of tax evasion.

*Sochurek*, 300 F.2d at 38.  "While all these factors may not be present in every situation, those appropriate should be properly considered and weighed." *Jones v. Commissioner*, 927 F.2d 849, 853 (5th Cir. 1991) (citing *Sochurek*, 300 F.2d at 38); *see also Bergersen v. Commissioner*, 109 F.3d 56, 61 (1st Cir. 1997) ("These [factors] have to be used with some caution because they are framed broadly, to cover disparate problems.").

The Government contends the abandonment of a prior residence is required to show residence elsewhere.  Petitioners correctly note no such action is required because, unlike the legal concept of domicile, a person may have more than one residence.  *See Jones v. Commissioner*, 927 F.2d 849, 853 (5th Cir. 1991) ("Residence is therefore much less than domicile[,] which requires an intent to make a fixed and permanent home."); *see also Dawson v. Commissioner*, 59 T.C. 264, 270 (1972) ("[I]t is possible to be a bona fide resident of one country while retaining one's domicile in another.").  While the law does not require taxpayers to abandon their prior residences to claim residency elsewhere, a court may consider whether a petitioner maintains strong ties to a location other than the claimed residence.  *See Bergersen*, 109 F.3d at 61-62 (holding the petitioners had not "moved their base" so as to be considered residents of Puerto Rico when they maintained close ties to their home state of Illinois, where they had recently purchased and renovated a house).

Applying the *Sochurek* factors to Richard and Lana Vento, this Court is compelled to find neither was a bona fide resident of the Virgin Islands as of December 31, 2001.  The subjective

*Sochurek* factors–whether the Ventos truly intended to be residents of the Virgin Islands at the end of 2001, or whether they traveled to the Virgin Islands in December 2001 for the purpose of avoiding federal income taxes–have particular relevance here because the timing of the family's decision to "move" to the Virgin Islands is suspicious.  The $180 million OSI sale occurred at the beginning of 2001, and the family would receive tax savings of more than $9 million *only* if they were Virgin Islands residents as of December 31, 2001.[49]  The Ventos' testimony that they intended to become Virgin Islands residents by the end of 2001 is undermined by the objective facts surrounding the family's purported "move"–the house they purchased was not liveable by the end of 2001, despite efforts to renovate it as quickly as possible; the house was not fully furnished by the end of 2001; the house only became liveable in 2003; none of the family's furniture or valuable personal possessions were brought to the property; the family spent very little time in the Virgin Islands during 2001 and 2002;[50] and the family primarily engaged in vacation-type activities, such as swimming and diving, when in the Virgin Islands.  The family did not have a bank account in the islands in 2001.  Although Richard was starting two businesses in the Virgin Islands, neither was up

---

[49] This type of situation is distinguishable from the fact pattern the First Circuit encountered in the *Bergersen* case.  109 F.3d 56.  There, the petitioners were slowly in the process of moving to Puerto Rico, where they would enjoy income tax advantages as soon as they could be considered residents.  *Id.*  The *Bergersen* court, tasked with determining exactly when the petitioners had moved, found tax motives should be accorded no weight in this determination because the petitioners were "perfectly free to consider tax advantages in moving their residence" and "tax motives provide[d] little help in determining *when* this move occurred."  *Id.* (emphasis added).  Here, while the Ventos could have taken into account whether they would receive a tax benefit from becoming bona fide residents of the Virgin Islands, consideration of their tax motive related to the OSI proceeds explains why they would take steps to appear to be residents by a very specific date–December 31, 2001.

[50] Although this Court's concern is solely whether the Ventos were residents on December 31, 2001, information about the nature of their activities during 2001 and 2002 is relevant to the Ventos' intent on that day.

and running by the end of 2001.  Moreover, although both Richard and Lana made occasional trips to the Virgin Islands during 2001 and 2002, they always returned to their main home in Nevada or their vacation home in Hawaii after only a short period of time, showing they lacked the intent to remain in the Virgin Islands for an "indefinite" period of time.  *Sochurek*, 300 F.2d at 38.   During their trips to St. Thomas in 2001, there is no evidence to show they were involved in community activities in the Virgin Islands or had "assimilat[ed]" into the islands' culture; Richard testified the family joined the St. Thomas Yacht Club, but they did not become members until 2002.  *Id.*  The lack of community involvement during 2001 is unsurprising, given that Richard and Lana were rarely present in St. Thomas during the year.

Additionally, evidence of the Ventos' lack of abandonment of the center of the family's business and domestic affairs in Incline Village, Nevada, is probative of whether they had a genuine intent to become residents of the Virgin Islands.  The family's office remained in Nevada, where several Vento family members owned homes.  Richard and Lana purchased property in Nevada in May 2001 which cost approximately $13.5 million, almost twice as much as the St. Thomas House. They planned to construct a massive home on that land, including a tennis court and a 22-car garage. In the interim period between the sale of their Incline Village House and the anticipated construction of the mansion, Richard and Lana planned to live in a condominium purchased by their Support Organization for their benefit.  Their plans to build a new home in Nevada did not change until sometime in 2007, and accordingly their own testimony demonstrates they had no intention of leaving their primary residence in Incline Village, Nevada, where they maintained strong ties, in 2001 or 2002.  The St. Thomas House was used as a vacation house in 2001 and 2002, when it was used at all.  Thus, although Richard and Lana had taken some steps to establish a home in the Virgin

Islands by the end of 2001, they were not bona fide residents as of December 31, 2001.

This Court next considers the individual circumstances related to the Vento daughters, whose claims are more easily resolved. Nicole has presented almost no evidence, other than her own self-serving testimony, to demonstrate she was a bona fide resident of the Virgin Islands at the end of 2001. During 2001 and 2002, Nicole and her husband lived in Incline Village, Nevada, where their children were enrolled in school. Nicole occasionally visited St. Thomas, but only for short periods of time after which she returned to her Nevada home. Indeed, Nicole was the only member of the Vento family not present in the Virgin Islands on December 31, 2001. Moreover, in 2003, Nicole and her husband claimed they had been continuous residents of Nevada since 1995. Any contrary testimony by Nicole in this litigation, where she stands to gain a large financial benefit by falsely testifying about her intent to become a Virgin Islands resident, is not credible in light of the objective facts regarding the location of Nicole and her family during the relevant time period. She was thus not a bona fide resident of the Virgin Islands as of December 31, 2001.

Gail, too, has not demonstrated she had a genuine intention of becoming a Virgin Islands resident as of December 31, 2001. Until December 2002, Gail attended college full-time in Boulder, Colorado, where she owned a home and resided with Walker. She did not move any significant personal possessions to the Virgin Islands in 2001. At the beginning of 2002, she invested in her Boulder area home by having the floors redone. When Gail and Walker wed in 2003, they did so in the municipality that served as the locus of the Vento family's activities–Incline Village, Nevada. Indeed, after Gail graduated from college in December 2002, she purchased a home in Incline Village near her family's other houses. While Gail eventually established closer ties to St. Thomas, this connection did not begin until the fall of 2003, when Gail and Walker moved themselves and

38

some personal property to St. Thomas.  As of December 31, 2001, however, the evidence shows Gail had not yet become a bona fide resident of the Virgin Islands, nor did she intend at that time to become a resident.

As for the Ventos' youngest daughter, Renee, her vacations to St. Thomas in 2001 and 2002 are insufficient to establish an intent to become a Virgin Islands resident during the relevant time period in light of her residency in Incline Village, Nevada, and her clear goal of obtaining a master's degree in California.  After graduating from college in June 2001, Renee worked and lived in Nevada.  In January 2002, Renee applied to photography school in California, representing herself as a Nevada resident.  Renee then moved to California to attend school in approximately March 2002.  The objective evidence thus shows she did not possess the intent to be a Virgin Islands resident as of December 31, 2001.

For the foregoing reasons, after applying the relevant *Sochurek* factors to each member of the Vento family, this Court has determined no member of the Vento family was a bona fide resident of the Virgin Islands at the end of 2001.

**CONCLUSIONS OF LAW**

1.      Richard Vento was not a bona fide resident of the United States Virgin Islands on December 31, 2001.

2.      Lana Vento was not a bona fide resident of the United States Virgin Islands on December 31, 2001.

3.      Nicole Mollison was not a bona fide resident of the United States Virgin Islands on December 31, 2001.

4.      Gail Vento was not a bona fide resident of the United States Virgin Islands on December 31, 2001.

5.      Renee Vento was not a bona fide resident of the United States Virgin Islands on December 31, 2001.

Judgement shall be entered in favor of Respondent United States of America and against Petitioner V.I. Derivatives, LLC in accordance with this opinion.


BY THE COURT:


  \s\ Juan R. Sánchez
Juan R. Sánchez, J.


cc:     Joycelyn Hewlett, Esq.
        Stuart D. Gibson, Esq.
        Dara B. Oliphant, Esq.
        Joseph M. Erwin, Esq.
        Marjorie R. Roberts, Esq.
        Joseph A. DiRuzzo, III, Esq.
        Edward M. Robbins, Jr., Esq.
        Tamika M. Archer, Esq.
        Aquannette Y. Chinnery-Montell, Esq.
        Carol Thomas-Jacobs, Esq.